United States District Court
Southern District of Texas

**ENTERED**

September 14, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COOPER INDUSTRIES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-0576 |
| | § | |
| PRECISION CASTPARTS CORP. | § | |
| and WYMAN-GORDON COMPANY, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cooper Industries, LLC ("Cooper") brought this action against defendants Precision Castparts Corp. ("Precision") and Wyman-Gordon Company ("Wyman") (together, "Defendants") seeking a declaratory judgment that Defendants must indemnify Cooper for and defend certain personal-injury asbestos liabilities and lawsuits pursuant to the terms of a stock purchase agreement between Cooper and Wyman and pursuant to the doctrine of collateral estoppel.[1]  Pending before the court are Plaintiff Cooper Industries, LLC's Motion for Summary Judgment ("Plaintiff's Motion") (Docket Entry No. 27) and Defendants' Motion for Summary Judgment ("Defendants' Motion") (Docket Entry No. 29).

## I.  Background and Procedural History

This action arises out of asbestos personal-injury claims stemming from the operations of Cameron Iron Works at its Katy Road

---

[1] See Original Complaint ("Complaint"), Docket Entry No. 1, pp. 1-2 ¶¶ 1-3.

facility.[2]  Cooper acquired Cameron Iron Works in 1989.[3]  From 1989

to 1994 Cameron Iron Works operated primarily in two business units

at the Katy Road facility:  the Oil Tools Division ("Oil Tools")

and Forged Products.[4]  In January of 1994 Wyman purchased the

Forged Products business from Cooper pursuant to the Amended and

Restated Stock Purchase Agreement (the "SPA") at issue in this

action.[5]  In January of 1995 Cooper transferred the Oil Tools

division to Cameron International Corporation ("Cameron") pursuant

to an Asset Transfer Agreement (the "ATA").[6]

---

[2]See Deposition of Bruce E. Himmelreich ("Himmelreich Deposition"), Exhibit 3 to Plaintiff's Motion, Docket Entry No. 28-3, p. 5 at 31:5-21.

[3]See Plaintiff's Motion, Docket Entry No. 27, p. 7; Oral Deposition, J. Ronald Sandberg ("Sandberg Deposition"), Exhibit 2 to Plaintiff's Motion, Docket Entry No. 28-2, p. 4 at 11:12-19.

[4]See Complaint, Docket Entry No. 1, p. 3 ¶ 10; Sandberg Deposition, Exhibit 2 to Plaintiff's Motion, Docket Entry No. 28-2, p. 4 at 11:12-19; Deposition of Wallace Whitney ("Whitney Deposition"), Exhibit 16 to Defendants' Motion, Docket Entry No. 30-16, p. 7 at 50:14-23.

[5]See Complaint, Docket Entry No. 1, p. 1 ¶ 11; Declaration of Chad Seber in Support of Defendants' Motion for Summary Judgment ("Seber Declaration"), Docket Entry No. 30, p. 1 ¶ 2; Whitney Deposition, Exhibit 16 to Defendants' Motion, Docket Entry No. 30-16, p. 7 at 50:14-23; Himmelreich Deposition, Exhibit 5 to Defendants' Motion, Docket Entry No. 30-5, p. 6 at 31:4 to p. 7 at 32:13.  The original SPA was effective January 10, 1994.  The parties executed an Amended and Restated SPA effective May 26, 1994, but it contains no changes to the clauses relevant to this dispute, and both parties attach and refer to the Amended and Restated SPA as the SPA.  See Defendants' Motion, Docket Entry No. 29, p. 9 n.1; Amended and Restated Stock Purchase Agreement, Exhibit 1 to Defendants' Motion, Docket Entry No. 30-1.  The SPA is also attached as Exhibit 1 to Plaintiff's Motion, Docket Entry No. 28-1, but citations will be to Docket Entry No. 30-1 for consistency.

[6]See Complaint, Docket Entry No. 1, p. 4 ¶ 13; Plaintiff's Motion, Docket Entry No. 27, p. 7; Defendants' Motion, Docket Entry No. 29, p. 9.

Cameron Iron Works and Cooper were later named as defendants in lawsuits alleging liability for asbestos exposure at Cameron Iron Works' former Katy Road facility.[7] Following the SPA, Wyman and Cooper allegedly agreed to split defense and indemnity costs for such suits when it was not clear whether the plaintiffs in such cases worked in Oil Tools or Forged Products.[8] If it could be determined at which division the employee worked, Wyman (and later, Precision) paid all of the claim and defense costs for Forged Products employees and Cooper was responsible for claims and defense costs for Oil Tools employees.[9] (Precision acquired Wyman in 2000.)[10] After the closing of the ATA, Cameron began sharing costs with Wyman.[11] The cost-sharing practice continued after

_____

[7]See Complaint, Docket Entry No. 1, pp. 3-4 ¶¶ 12-13; Defendants' Motion, Docket Entry No. 29, p. 9; Plaintiff's Motion, Docket Entry No. 27, p. 7.

[8]See Whitney Deposition, Exhibit 4 to Plaintiff's Motion, Docket Entry No. 28-4, p. 7 at 68:8-69:11.

[9]See Himmelreich Deposition, Exhibit 3 to Plaintiff's Motion, Docket Entry No. 28-3, p. 7 at 62:19-63:2. Wyman generally agrees with these facts, asserting that "Cameron took responsibility for defending and settling the asbestos cases arising out of Katy Road. However, Wyman began an arrangement with Cameron by which Wyman reimbursed costs associated with Katy Road asbestos claims to the extent they involved Forged Products' operations . . . ." Defendants' Motion, Docket Entry No. 29, p. 10; see also Himmelreich Deposition, Exhibit 5 to Defendants' Motion, Docket Entry No. 30-5, p. 8 at 36:19 to p. 9 at 37:9.

[10]See Complaint, Docket Entry No. 1, p. 4 ¶ 14; Defendants' Motion, Docket Entry No. 29, p. 10; Plaintiff's Motion, Docket Entry No. 27, p. 7.

[11]See Himmelreich Deposition, Exhibit 3 to Plaintiff's Motion, Docket Entry No. 28-3, p. 3 at 21:19-24:24.

Precision acquired Wyman, and between 1994 and 2006 Defendants paid over $1.2 million on more than 100 claims.[12]

The cost sharing continued until 2006, when Precision informed Cameron that it would no longer contribute to defending and settling asbestos claims.[13]  That year a case involving asbestos-exposure injuries settled for $2.2 million (the "Sutterfield case").[14]  Emi Donas, Precision's associate general counsel, attended the mediation that led to the Sutterfield settlement, and soon thereafter she informed Cameron that Wyman would not pay any portion of the Sutterfield settlement or future asbestos-injury claims.[15]

On January 25, 2007, Cameron sued Wyman and Precision in Texas state court asserting that Defendants' refusal to pay their portion of the Sutterfield settlement constituted a breach of Defendants' agreement to share costs with Cameron.[16]  Precision and Wyman denied

---

[12]See id. p. 4 at 25:3-26:4; 71:5-21.  See also Exhibit 5 to Plaintiff's Motion, Docket Entry Nos. 28-5, 28-6, 28-7, 28-8 (correspondence, invoices, and checks regarding shared defense and settlement costs between Cooper, Wyman, and Precision).

[13]Defendants' Motion, Docket Entry No. 29, p. 10.  See also Complaint, Docket Entry No. 1, p. 4 ¶¶ 14-15; Defendants' Answer to Complaint ("Answer"), Docket Entry No. 8, ¶¶ 14-15.

[14]See Himmelreich Deposition, Exhibit 3 to Plaintiff's Motion, Docket Entry No. 28-3, p. 4 at 26:7-28:2, p. 6 at 34:9-25.

[15]See Himmelreich Deposition, Exhibit 3 to Plaintiff's Motion, Docket Entry No. 28-3, p. 4 at 26:7-28:2; Email from Himmelreich at Cameron to Precision and Wyman detailing the concern at the breakdown of the payment arrangement after the Sutterfield settlement, Exhibit 18 to Plaintiff's Response, Docket Entry No. 32-21.

[16]See Plaintiff's Original Petition, Cause No. 2007-05527, Exhibit 6 to Plaintiff's Motion, Docket Entry No. 28-9, p. 4 ¶¶ 7-8; Defendants' Answer to Complaint ("Answer"), Docket Entry No. 8, p. 3 ¶ 15; Complaint, Docket Entry No. 1, p. 4 ¶ 15.

liability for the claims and argued that the cost sharing arrangement did not override the SPA's express terms.[17] Wyman and Cameron entered a Rule 11 agreement on January 22, 2009, agreeing to stay the state court action in order to initiate arbitration with Cooper.[18] Cameron and Wyman exchanged drafts of a demand letter and the arbitration demand.[19] Wyman sent a letter to Cooper declaring a dispute under the SPA, and Cameron filed an arbitration demand against Cooper.[20] Cameron had a contractual right to initiate arbitration with Cooper under the ATA, but Wyman did not have the ability to compel Cooper to arbitrate.[21] Thus, Wyman

---

[17]Defendants' Motion, Docket Entry No. 29, p. 10; Answer, Docket Entry No. 8, pp. 3-4 ¶ 16; Complaint, Docket Entry No. 1, p. 5 ¶ 16.

[18]Seber Declaration, Docket Entry No. 30, pp. 1-2 ¶ 4; Rule 11 Agreement dated January 22, 2009, in Cause No. 2007-05527; Cooper Cameron Corp. v. Wyman Gordon, and Precision ("Rule 11 Agreement"), Exhibit 2 to Defendants' Motion, Docket Entry No. 30-2; Exhibit 7 to Plaintiff's Motion, Docket Entry No. 28-10.

[19]See Email from Emi Donis (Precision) re: ADR in Cooper/Wyman agreement, Exhibit 8 to Plaintiff's Motion, Docket Entry No. 28-11; Email from Susan Swanson (counsel for Cameron) re: Cameron v. Wyman Gordon/Precision Castparts, Exhibit 9 to Plaintiff's Motion, Docket Entry No. 28-12.

[20]See Confidential Settlement Negotiations dated June 3, 2009, Re: Indemnity Dispute from Precision to Cooper, Exhibit 10 to Plaintiff's Motion, Docket Entry No. 28-13; Demand for Arbitration, Cameron International Claimant, Cooper Respondent, Exhibit 11 to Plaintiff's Motion, Docket Entry No. 28-14.

[21]Defendants' Motion, Docket Entry No. 29, pp. 10-11; see generally Seber Declaration, Docket Entry No. 30, pp. 1-2 ¶¶ 4-6; Rule 11 Agreement, Exhibit 2 to Defendants' Motion, Docket Entry No. 30-2; Letter dated February 24, 2009, Re: Arbitration Demand — Cause No. 2007-05527; Cooper Cameron Corp. v. Wyman Gordon Company, and Precision Castparts Corp.; In the 234th Judicial District Court (continued...)

asserts, the Rule 11 agreement was dependent upon Cooper's agreeing to allow Wyman to participate in the arbitration.[22]

Cameron requested in February and March of 2009 that Cooper agree to include Wyman and Precision in a trilateral arbitration.[23] Cooper allegedly ignored Cameron's requests, and the arbitration did not move forward.[24]  Cameron subsequently renewed its state-court action against Precision and Wyman, but on March 15, 2010, Cameron voluntarily dismissed the action.[25] Wyman alleges that from the 2010 dismissal until March 25, 2015, Wyman and Precision did not receive demands for contribution for asbestos liabilities from Cameron or Cooper and had no involvement in or awareness of their arbitration.[26]

---

[21](...continued)
of Harris County, Texas, Exhibit 3 to Defendants' Motion, Docket Entry No. 30-3; Letter dated March 5, 2009, Re: Arbitration Demand — Cause No. 2007-05527; Cooper Cameron Corp. v. Wyman Gordon Company, and Precision Castparts Corp.; In the 234th Judicial District Court of Harris County, Texas, Exhibit 4 to Defendants' Motion, Docket Entry No. 30-4.

[22]See note 21, supra.

[23]Id.

[24]See Defendants' Motion, Docket Entry No. 29, p. 11; Himmelreich Deposition, Exhibit 5 to Defendants' Motion, Docket Entry No. 30-5, p. 10 at 74:7-23; Seber Declaration, Docket Entry No. 30, p. 2 ¶ 6.

[25]See Seber Declaration, Docket Entry No. 30, p. 2 ¶¶ 7, 8; Plaintiff, Cooper Cameron Corporation's Motion for Non-Suit of Wyman Gordon Company and Precision Castparts Corp., Exhibit 6 to Defendants' Motion, Docket Entry No. 30-6.

[26]See Defendants' Motion, Docket Entry No. 29, p. 11; Seber Declaration, Docket Entry No. 30, p. 2 ¶ 9.

Arbitration proceeded between Cooper and Cameron. Cooper asserts that "Cameron essentially adopted and litigated Wyman's position that Wyman was not liable for Forged Products asbestos claims."[27] The arbitration panel held that "[i]t is clear from the SPA that Cooper transferred all liabilities to [Wyman] in the SPA."[28] The arbitration panel granted summary judgment on some claims, the parties settled the remaining claims, and a Texas state court confirmed the arbitration award in January of 2015.[29]

Following confirmation, Cooper determined that a pending claim naming Cameron Iron Works as defendant allegedly involved a Forged Products employee: Gatlin v. Cameron Iron Works U.S.A., Inc., Cause No. 2012-73370, Harris County Multidistrict Litigation, Texas, originally filed as Cause No. A193-233 (58th District Court, Jefferson County, Texas).[30] On December 21, 2012, Cooper first

---

[27]See Plaintiff's Motion, Docket Entry No. 27, p. 8; Cameron's Motion for Summary Judgment Concerning Cooper's Responsibility for Liabilities Arising from Forged Products in Cameron v. Cooper Industries, LLC, Exhibit 12 to Plaintiff's Motion, Docket Entry No. 28-15, pp. 8-11.

[28]See Panel's Decision on Motions for Summary Judgment, Exhibit 13 to Plaintiff's Motion, Docket Entry No. 28-16, p. 3.

[29]See id.; Settlement Agreement in Cameron v. Cooper Industries, LLC, Exhibit 14 to Plaintiff's Motion, Docket Entry No. 28-17; Judgment Confirming Arbitration Award Under Seal in Cooper v. Cameron International Corporation, Exhibit 15 to Plaintiff's Motion, Docket Entry No. 28-18.

[30]See Plaintiff's Motion, Docket Entry No. 27, p. 9. The Gatlin petition names Cameron and Cooper (among others) as defendants but does not specify whether Gatlin worked in Forged Products or Oil Tools. See Defendants' Motion, Docket Entry No. 29, p. 11; Gatlin Petition, Exhibit 7 to Defendants' Motion, Docket Entry No. 30-7, pp. 10-22. Discovery responses from that
(continued...)

tendered the Gatlin complaint to Cameron, claiming that Cameron
assumed that liability under the ATA and was "solely responsible"
for that claim, but Cameron rejected the tender.[31]  Precision and
Wyman were allegedly unaware of the Gatlin action for over two
years, until on March 3, 2015, when Cooper tendered the action to
Precision and Wyman.[32]  Cooper received no response from Defendants
to its original tender or its follow up letter.[33]

---

[30](...continued)
action state that "from 1968 through 1981 [Gatlin] was an
inspector/laborer at Cameron Iron Works in Houston, TX."  See
Plaintiffs' Responses to Master Interrogatories, Requests for
Production and Requests for Disclosure ("Plaintiffs' Responses to
Master Interrogatories"), (MDL Cause No. 2012-73370, transferred
from Cause No. 33353, Gatlin v. Cameron Iron Works), Exhibit 8 to
Defendants' Motion, Docket Entry No. 30-8, p. 4, Answer 6.

[31]See Defendants' Motion, Docket Entry No. 29, p. 12; Letter
from Cooper to Cameron dated December 21, 2012, Re: Gatlin v.
Cameron Iron Works, Exhibit 9 to Defendants' Motion, Docket Entry
No. 30-9, p. 1 ("Cooper believes this is a liability for which
Cameron is responsible under [the ATA].")  Letter from Cameron to
Cooper dated January 16, 2013, Re: Gatlin v. Cameron Iron Works,
Exhibit 10 to Defendants' Motion, Docket Entry No. 30-10, p. 1
("Cameron believes that asbestos lawsuits arising from [Cameron
Iron Works] are 'Retained Liabilities' of Cooper under the ATA.").

[32]See Defendants' Motion, Docket Entry No. 29, p. 12; Seber
Declaration, Docket Entry No. 30, p. 3 ¶¶ 14, 15; Letter to
Precision and Wyman dated March 3, 2015, Re: Gatlin v. Cameron Iron
Works, No. 2012-73370 ("Gatlin Tender to Cameron"), Exhibit 16 to
Plaintiff's Motion, Docket Entry No. 28-19, Exhibit 11 to
Defendants' Motion, Docket Entry No. 30-11 (tendering Gatlin
complaint); Plaintiff's Original Petition in Cause No. A193-233,
Exhibit 16A to Plaintiff's Motion, Docket Entry No. 28-10
(Exhibit 7 to Defendants' Motion, Docket Entry No. 30-7, p. 10).

[33]See Gatlin Tender to Cameron, Exhibit 16 to Plaintiff's
Motion, Docket Entry No. 28-19, Exhibit 11 to Defendants' Motion,
Docket Entry No. 30-11;  Plaintiff's Original Petition in Cause
(continued...)

Cooper then brought this action, asserting two claims: (1) a declaratory judgment interpreting the SPA and confirming that Defendants assumed personal-injury asbestos liabilities related to the Forged Products division and are required to indemnify and defend for such liabilities pursuant to the SPA; and (2) a declaratory judgment that the arbitration panel's decision in the Cooper-Cameron arbitration has collateral estoppel or <u>res judicata</u> effect in this action.[34]   Following the completion of fact discovery, both parties moved for summary judgment.   Cooper seeks summary judgment that Wyman is liable for asbestos personal-injury claims under the SPA as a matter of law, and Defendants seek summary judgment in their favor on both of Cooper's claims.[35]

## II.   <u>Standard of Review</u>

Summary judgment is appropriate if the movant establishes that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a). Disputes about material facts are genuine "if the evidence is such

---

[33] (...continued)
No. A193-233, Exhibit 16A to Plaintiff's Motion, Docket Entry No. 28-10 (Exhibit 7 to Defendants' Motion, Docket Entry No. 30-7, p. 10); Letter to Precision and Wyman dated March 3, 2015, Re: <u>Gatlin v. Cameron Iron Works</u>, No. 2012-73370, Exhibit 17 to Plaintiff's Motion, Docket Entry No. 28-21 (following up on the March 3, 2015, letter to which Cooper had not received a response); <u>see also</u> Defendants' Motion, Docket Entry No. 29, p. 11.

[34]<u>See</u> Complaint, Docket Entry No. 1, pp. 7-9 ¶¶ 24-32.

[35]<u>See</u> Plaintiff's Motion, Docket Entry No. 27, pp. 6-7; Defendants' Motion, Docket Entry No. 29, p. 7.

that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2510 (1986).  The moving party is entitled to judgment as a matter of law if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2552 (1986).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting <u>Celotex</u>, 106 S. Ct. at 2553).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." <u>Id.</u>  If, however, the moving party meets this burden, "the nonmovant must go beyond the pleadings" and produce evidence that specific facts exist over which there is a genuine issue for trial. <u>Id.</u> (citing <u>Celotex</u>, 106 S. Ct. at 2553-54).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986).

"In order to avoid summary judgment, the nonmovant must identify specific facts within the record that demonstrate the existence of a genuine issue of material fact." <u>CQ, Inc. v. TXU Mining Co., L.P.</u>, 565 F.3d 268, 273 (5th Cir. 2009).  "The party

-10-

must also articulate the precise manner in which the submitted or identified evidence supports his or her claim." <u>Id.</u> (internal quotation marks and citation omitted). "When evidence exists in the summary judgment record but the nonmovant *fails even to refer to it* in the response to the motion for summary judgment, that evidence is not properly before the district court." <u>Id.</u> (same).

In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 120 S. Ct. 2097, 2110 (2000). The court resolves factual controversies in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." <u>Little</u>, 37 F.3d at 1075. In a contract interpretation dispute, summary judgment is appropriate where the language of the contract is unambiguous. <u>See Hanssen v. Qantas Airways Ltd.</u>, 904 F.2d 267, 269 n.3 (5th Cir. 1990) (citation omitted).

### III.   <u>The Cross-Motions for Summary Judgment</u>

Cooper's motion presents four issues:

(1) The indemnity clauses in § 5.22(e) and § 5.22(f) of the SPA are unambiguous and require Wyman to indemnify Cooper for asbestos personal-injury claims;

(2) Even if the SPA's indemnity clauses in § 5.22(e) and § 5.22(f) are ambiguous, the parties' intent in drafting and the parties' course of dealing establish as a matter of law that liability for asbestos personal-injury claims was transferred to Wyman;

(3) Collateral estoppel establishes Wyman's liability for asbestos personal-injury claims; and

(4) Wyman is estopped from asserting any construction of the SPA that requires Cooper to indemnify Wyman for asbestos personal-injury claims.[36]

Defendants argue that summary judgment for Defendants is appropriate on Cooper's first claim because the plain terms of the SPA allocate asbestos liabilities arising from Forged Products' operations at the Katy Road site to Cooper.[37]  Defendants argue that summary judgment for Defendants is appropriate on Cooper's second claim because Defendants were neither parties to nor in privity with either party in the arbitration between Cooper and Cameron, and the issues here were not fully and fairly litigated in the arbitration.[38]  Defendants also argue that Precision is entitled to summary judgment on both claims because it is not liable for any obligations under the SPA as a non-party thereto.[39]

## A.   The Indemnity Clauses in SPA § 5.22(e) and § 5.22(f)

### 1.   Applicable Law

A federal court sitting in diversity applies the choice of law rules of the forum state, and Texas law generally gives effect to contractual choice-of-law clauses.  See Spence v. Glock, Ges.m.b.H., 227 F.3d 308, 311 (5th Cir. 2000) (citing Klaxon Co. v. Stentor

---

[36]See Plaintiff's Motion, Docket Entry No. 27, pp. 6-7.

[37]See Defendants' Motion, Docket Entry No. 29, p. 7.

[38]See id.

[39]See id.

Electric Manufacturing Co., 61 S. Ct. 1020, 1021-22 (1941)); Smith
v. EMC Corp., 393 F.3d 590, 597 (5th Cir. 2004); Exxon Mobil Corp.
v. Drennen, 452 S.W.3d 319, 324-31 (Tex. 2014).  The parties agree
that New York law therefore governs the relevant construction issues
pursuant to a choice of law clause in Section 8.9.[40]

Under New York law, "where the language is clear, unequivocal
and unambiguous, the contract is to be interpreted by its own
language."  R/S Associates v. New York Job Development Authority,
771 N.E.2d 240, 242 (N.Y. 2002) (quotation and citations omitted).
When a contract is unambiguous, the court will not consider
extrinsic evidence.  See id.  The contract must be construed to
give full effect to all terms.  Acme Supply Co., Ltd. v. City of
New York, 834 N.Y.S.2d 142, 143 (N.Y. App. Div. 2007); see also
Ellington v. EMI Music, Inc., 21 N.E.3d 1000, 1003 (N.Y. 2014)
("Where the terms of a contract are clear and unambiguous, the
intent of the parties must be found within the four corners of the
contract, giving a practical interpretation to the language
employed and reading the contract as a whole.").

An ambiguous term is one that is "capable of more than one
meaning when viewed objectively by a reasonably intelligent person
who has examined the context of the entire integrated agreement and
who is cognizant of the customs, practices, usages and terminology

---

[40]See SPA § 8.9, Exhibit 1 to Defendants' Motion, Docket Entry
No. 30-1, p. 117; Plaintiff's Motion, Docket Entry No. 27, p. 10;
Defendants' Motion, Docket Entry No. 29, p. 12.

as generally understood in the particular trade or business." Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper, No. 99 Civ. 2952(LBS), 2003 WL 22741664, at *3 (S.D.N.Y. Nov. 18, 2003) (citation omitted); see also Royal & Sun Alliance Insurance, PLC v. E.C.M. Transport, Inc., No. 14 Civ. 3770(JFK), 2015 WL 5098119, at *5 (S.D.N.Y. Aug. 31, 2015). Summary judgment is appropriate where the language of the contract is unambiguous. See Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996); Hanssen, 904 F.2d 267, 269 n.3 (5th Cir. 1990) (citation omitted); U.S. Energy Systems, Inc. v. Enviro Partners, L.P., No. 97 CIV. 1748(JFK), 1999 WL 123806, at *6 (S.D.N.Y. March 8, 1999).

2.   The Language of the SPA

Both parties argue that the SPA language is unambiguous. Cooper argues that "[t]he language of the SPA confirms the application of the general rule with regard to the asbestos liabilities of Forged Products because (1) exclusions to Wyman's liabilities found in § 5.22(f) are inapplicable; and (2) asbestos liabilities for employee exposures related to the manufacture of products are 'Product Liability Claims' specifically identified as Wyman liabilities in § 5.22(e)."[41] Defendants argue that

> Cooper is responsible for liabilities that arise from an
> alleged exposure at the Katy Road Site to asbestos
> discharged into the internal workplace air because these
> liabilities arise "by reason of or resulting from . . .
> Regulated Materials disposed of on, or discharged into

---

[41]Plaintiff's Motion, Docket Entry No. 27, p. 10.

the environment at, the Katy Road Site . . . on or before the Closing Date . . . ." SPA § 5.22(f). Because these liabilities are addressed by Section 5.22(f), they are expressly excluded from Wyman's allocated liabilities in Section 5.22(e), which does not apply to "the Losses that the Seller is required to indemnify pursuant to . . . Section 5.22(f) . . . ." SPA § 5.22(e). The parties therefore agreed that liabilities arising from a discharge of Regulated Materials at the Katy Road site — including asbestos — would be Cooper's responsibility, not Wyman's.[42]

SPA § 5.22 contains the parties' respective indemnification obligations. Section 5.22(e), "Additional Indemnification by [Wyman],[43]" defines Wyman's indemnification obligations in relevant part as follows:

Subject to the terms and conditions of this Section 5.22 and in addition to the indemnification provided for in Section 5.22(b), [Wyman] agrees, other than the Losses that [Cooper] is required to indemnify pursuant to Section 5.22(b)[44] or Section 5.22(f) . . . to indemnify and hold [Cooper] harmless from and against all Losses which [Cooper] may suffer, sustain or become subject to by reason of or resulting from any liabilities or obligations of or relating to, or claims against, any Cameron Entity[45] or the Business[46] on, before or after the

---

[42]Defendants' Motion, Docket Entry No. 29, p. 14.

[43]"Buyer" and "Buyer's Group" have been replaced with "Wyman" for ease of discussion. "Seller" and "Seller's Group" have been replaced with "Cooper."

[44]Section 5.22(b) refers to indemnification for breaches of the warranties, representations, and covenants of the SPA and is not relevant to this dispute. See SPA § 5.22(b), Exhibit 10 to Defendants' Motion, Docket Entry No. 30-1, p. 100.

[45]"Cameron Entities" is defined to include "that portion of each of the following companies to the extent that it presently conducts or previously conducted all or part of the Business: . . . (ii) the forged products division of Cameron Iron Works, Inc., (iii) the forged products division of Cameron Iron Works USA, 

(continued...)

Closing Date, including without limitation (I) to indemnify and hold [Cooper] harmless from and against all Losses which the [Cooper] may suffer, sustain or become subject to by reason of or resulting from any Product Liability Claims arising out of or resulting from Products sold or furnished by [Cooper], any of its Affiliates or any Cameron Entity (including without limitation any product liability assumed in connection with the acquisition of any business or product line) on, before or after the Closing Date; (ii) to indemnify and hold [Cooper] harmless from and against all Losses which [Cooper] may suffer, sustain or become subject to by reason of or resulting from (A) any noncompliance of the operations, properties or business activities of any Cameron Entity or the Business with any Environmental Law on, before or after the Closing Date or (B) any liabilities or obligations of or relating to, or claims against, any Cameron Entity or the Business based upon any Environmental Law, or arising from the disposal of any Regulated Materials, on, before, or after the Closing Date . . . .

Section 5.22(f) describes "Additional Indemnification by [Cooper]:"

Subject to the terms and provisions of this Section 5.22 and in addition to the indemnification provided for in Section 5.22(b), [Cooper] agrees, other than the Losses that [Wyman] is required to indemnify pursuant to Section 5.22(b) . . . (I) to indemnify and hold [Wyman] harmless from and against all Losses which the [Wyman] may suffer, sustain or become subject to by reason of or resulting from any liabilities or obligations of or relating to, or claims against, [Cooper] or [Cooper's] Subsidiaries[47] on,

_____

[45](...continued)
Inc., . . . (v) the forged products division of Cameron Iron Works Limited." See id. § 5.22(h)(iv), p. 106.

[46]"Business" is defined as "research, development, engineering, melting, refining, remelting, forging, extrusion, machining, manufacturing, distribution, sales, marketing, service or repair operations associated with the Products." Id. § 5.22(h)(ii), p. 106.

[47]"[Cooper] Subsidiaries" are defined as "the subsidiaries of the Seller other than the Company and the Company Subsidiaries." See id. § 3.4, p. 24. The "Company" is defined to mean "Cameron Forged Products Company." See id. at p. 6.

before or after the Closing Date to the extent that such
liabilities, obligations or claims (x) do not relate to
the Business and (y) arise from the activity of (a) any
Cameron Entity (other than the Company or the Pipeline
Sub) before the Closing Date, or (b) [Cooper] or any of
[Cooper's]  subsidiaries  (other  than  the  Cameron
Entities),  (ii)  except  to  the  extent  the  actions  of
[Wyman],  the  Company  or  their  Affiliates  may  cause  or
increase  any  such  Losses  after  the  Closing  Date,  to
indemnify  and  hold  [Wyman]  harmless  from  and  against  all
Losses  which  [Wyman]  may  suffer,  sustain  or  become
subject  to  by  reason  of  or  resulting  from  any  Regulated
Materials  disposed  of  on,  or  discharged  into  the
environment  at,  the  Katy  Road  Site  or  the  Gulf  Metals
Site  on  or  before  the  Closing  Date  .  .  .  .

Cooper argues that under § 5.22(e) Wyman agreed to retain all

environmental liabilities related to the Forged Products business

unless those liabilities were specifically carved out in § 5.22(f),

which  does  not  carve  out  asbestos  liabilities.[48]    Subsection

5.22(f)(ii)  does  carve  out  liabilities  resulting  from  "Regulated

Materials"  "disposed  of  on,  or  discharged  into  the  environment  at,

the  Katy  Road  Site."[49]    Wyman  argues  that  this  unambiguously

includes  workplace  exposures  to  asbestos,  so  that  "these

liabilities  are  expressly  excluded  from  the  liabilities  allocated

to Wyman under Section 5.22(e)" and "Defendants are accordingly not

liable  for  these  liabilities  under  Section  5.22(e)  or  any  other

portion of the SPA."[50]

---

[48]See Plaintiff's Motion, Docket Entry No. 27, p. 11.

[49]Id. at 12.

[50]Defendants'  Motion,  Docket  Entry  No.  29,  pp.  14,  20-21;
Defendant  Wyman-Gordon  Company's  Response  to  Cooper  Industries'
Motion for Summary Judgment ("Defendants' Response"), Docket Entry
(continued...)

The parties' arguments thus turn on the meaning of "disposed of on," "discharged into," and the "environment." The SPA does not define these terms.  Cooper argues that the plain-language meaning of "disposed of" and "discharged into" are active verbs requiring an intentional and affirmative act, not an incidental release.[51] Cooper also argues that these are terms of art in the environmental context and specifically refer to soil and groundwater contamination.[52]  Defendants respond that under applicable law and other clauses of the SPA, as a matter of law, toxic tort asbestos claims arise from a discharge into the environment.[53]

---

[50](...continued)
No. 34, p. 9.  Defendants rely only on the "discharged into the environment" language because the underlying Gatlin asbestos claim involved a discharge of asbestos dust into the air.  See Defendants' Response, Docket Entry No. 34, p. 9 n.3 (citing Plaintiffs' Responses to Master Interrogatories, Exhibit 8 to Defendants' Motion, Docket Entry No. 30-8, p. 4 (discussing Mr. Gatlin's occupational exposure to asbestos)).

[51]Plaintiff's Motion, Docket Entry No. 27, p. 12.

[52]See id. Wyman argues that asbestos is a "Regulated Material" and notes that Cooper does not dispute that point in its motion. See Defendants' Motion, Docket Entry No. 29, p. 15; Defendants' Response, Docket Entry No. 34, p. 9 (citing Jones v. Cain, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived.").  Therefore, Wyman argues, Cooper has conceded the same.  Cooper's motion does not address whether asbestos is a regulated material.  Cooper's Response indicates that whether asbestos is a Regulated Material under the SPA is largely irrelevant to interpreting the asbestos personal-injury claims at issue in the Complaint, but that the SPA allocates asbestos personal injury liability to Wyman, even if asbestos is a "Regulated Material."  See Plaintiff Cooper Industries, LLC's Response in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 31, p. 7.

[53]See Defendants' Response, Docket Entry No. 34, pp. 9-10; Defendants' Motion, Docket Entry No. 29, pp. 16-20.

i. Defendants' Motion

Defendants argue that § 5.22(f) clearly includes asbestos discharged into internal workplace air and such liabilities are thus excluded from § 5.22(e).[54] Defendants argue that "discharge into the environment" applies to internal workplace exposure to asbestos under applicable case law.[55] Cooper responds that under controlling New York law "discharge" and "disposal" are terms of art that do not include asbestos in workplace air and that the plain language of environmental regulations and the SPA distinguish between "workplace" and "environment."[56] Cooper also argues that the environmental disclosures in the SPA indicate that the parties' concerns with the Katy Road and Gulf Metals sites were limited to soil and groundwater contamination and Superfund liability.[57]

Defendants rely on Tragarz v. Keene Corp., 980 F.2d 411, 413, 425 (7th Cir. 1992), where the court had to decide "whether the release of large amounts of asbestos into the internal, workplace environment exclude[d] th[e] case from a comparative fault analysis under Ill. Rev. Stat., ch. 110, ¶ 2-1118." Mr. Tragarz alleged negligence claims against multiple manufacturers of asbestos insulation products after he developed mesothelioma. Id. at

---

[54]See Defendants' Motion, Docket Entry No. 29, p. 14.

[55]See id. at 16.

[56]See Plaintiff's Response, Docket Entry No. 31, p. 7.

[57]See id.

-19-

413-14.  Mr. Tragarz worked in construction alongside insulators and pipefitters who installed and cut products containing asbestos, generating asbestos dust.  Id. at 414-15.  A jury awarded a verdict for Tragarz, and defendants appealed, arguing that they should have been allowed to offer evidence of Tragarz's exposure to other products for purposes of showing comparative fault under Illinois' statutory scheme, which eliminated pure joint-and-several liability.  See id. at 417, 425.

Tragarz argued that a section imposing joint and several liability as an exception to comparative fault applied.  Id. at 426.  The statutory exception imposed joint and several liability on defendants found liable "in any action in which the trier of fact determines that the injury or damage for which recovery is sought was caused by an act involving the discharge into the environment of any pollutant, including any waste, hazardous substance, irritant or contaminant, including, but not limited to, . . . asbestos . . . ."  Id. at 425-26 (quoting Ill. Rev. Stat., ch. 110, ¶ 2-1118).  The defendants argued that the joint and several liability statute did not apply because "discharge into the environment means discharge into the external environment and not discharge into the environment internal to a building or workplace."  Id. at 426.

The court found no Illinois precedent on point, but the defendants argued that cases interpreting similar language in CERCLA supported their position.  See id. at 427.  The court

-20-

recognized that Illinois' joint and several liability statute and
CERCLA were "two very different statutes;" CERCLA "focuses on the
national concern of public health and environment while Illinois's
. . . statute focuses on individual, personal injury and property
claims." <u>Id.</u> at 427, 428.   The court reasoned that with that
change in focus could come a change in the meaning of the term
"environment." <u>Id.</u>[58] Finding "discharge into the environment" not
surrounded by equally broad terms, and with no rule of construction
like in the insurance context, the court held that the statutory
exception applied. <u>Id.</u>   The court also undertook an analysis to
determine whether its interpretation comported with legislative
intent, comparing the statute to similar language in the Illinois
Environmental Protection Act and the statute's legislative history.
<u>Id.</u> at 429.   The Seventh Circuit concluded that the district court
had appropriately excluded evidence of Tragarz's exposure to other
manufacturer's products, holding:

> Because a comparison of the joint and several liability
> provision and IEPA indicates that discharge into the
> environment under the joint and several liability statute
> includes large discharges of asbestos into an internal

---

[58]The court also distinguished defendants' second line of cases
involving "pollution exclusions" in insurance contracts.   <u>See</u>
<u>Tragarz</u>, 980 F.2d at 428 (discussing <u>United States Fidelity &</u>
<u>Guaranty Co. v. Wilkin Insulation Co.</u>, 578 N.E.2d 926 (Ill. 1991)).
In one such case, <u>Wilkin Insulation</u>, the policy excluded coverage
for the discharge of "irritants, contaminants or pollutants into or
upon the land, the atmosphere or any water course or body of
water." <u>Id.</u>   The <u>Tragarz</u> court noted that the <u>Wilkin Insulation</u>
court relied on the use of the word "atmosphere" and the terms
"into or upon land" and "any course or body of water," which
suggest the external atmosphere. <u>Id.</u>

workplace environment, and because such an interpretation
is consistent with, and in fact promotes, the legislative
purpose reflected in the legislative history, we agree
[that § 2-1118 applies].

Id. at 430.

In addition to this authority, Defendants argue that they are
entitled to prevail under the plain language of the SPA and that
"the indemnification clause in the SPA does not contain the
references to 'land,' 'atmosphere,' 'water course,' or 'body of
water' that have previously been cited as evidence in pollution
exclusion insurance cases that the clause applies exclusively to
the external environment."[59]   See Tragarz, 980 F.2d at 428.
Defendants argue that "construing the clause 'any Regulated
Materials . . . discharged into the environment' narrowly to refer
exclusively to the external environment would contradict the broad
definition of 'Regulated Materials' set forth in the SPA."[60]
"Regulated Material" means any material, substance, radiation or
emission that is regulated by or subject to any Environmental Law.[61]
"Environmental Laws" include CERCLA, the Solid Waste Disposal Act,
the Clean Air Act, the Clean Water Act, the Toxic Substances
Control Act, and the Occupational Safety and Health Act.[62]

---

[59]See Defendants' Motion, Docket Entry No. 29, pp. 18-20
(citing Tragarz, 980 F.2d at 428).

[60]See id. at 18.

[61]SPA § 3.15(c), Exhibit 1 to Defendants' Motion, Docket Entry
No. 30-1, p. 35.

[62]See id. § 3.15(b) p. 35.

Defendants note that "[l]ong prior to the SPA, OSHA regulated asbestos, had as its principal focus the internal workplace environment, and used 'environment' (as well as 'atmosphere' and 'air') to refer to internal workplace environments, not external environments."[63]   For example, one 1986 OSHA regulation provides:

> [T]wo environments may be affected by an OSHA regulatory action: (1) The workplace environment and (2) the general human environment external to the workplace, including impacts on air and water pollution, solid waste, and energy, and land use . . . .   These regulations are beneficial to the workplace environment because they reduce worker exposure to toxic and carcinogenic substances. An in-depth discussion and analysis of the occupational nature of asbestos disease, the workplace environment, and the benefits to workers as a result of this rule are presented in earlier sections of this Notice.[64]

Defendants point to other portions of the SPA that they contend confirm that Cooper interpreted "Regulated Materials" and "environmental" issues to include asbestos in the internal workplace environment.[65]   In § 3.15 of the SPA, "Environmental Compliance," Cooper warranted that "[e]xcept as set forth on Section 3.15 of the Seller Disclosure Schedule," its operations were in compliance with "all Environmental Laws" and Cooper was not

---

[63]See Defendants' Motion, Docket Entry No. 29, p. 18; Sample Usages of "Environment," "Atmosphere," and "Air" in OSHA Regulations addressing Internal Workplace Exposure to Asbestos Before 1994 ("Sample OSHA Regulations"), Exhibit 14 to Defendants' Motion, Docket Entry No. 30-14.

[64]Sample OSHA Regulations, Exhibit 14 to Defendants' Motion, Docket Entry No. 30-14, p. 1 (citing 51 FR 22612 at 22671).

[65]See Defendants' Motion, Docket Entry No. 29, p. 19.

"subject to any claim, notice of investigation or liability based upon any Environmental Law or arising from the disposal of any Regulated Material . . . ."[66]  Cooper's § 3.15 Disclosure Schedule lists "[a]sbestos containing material at the site in the form of floor tile and mastic" for a Cypress, Texas facility.[67]  Defendants argue that "Cooper accordingly acknowledged that the existence of asbestos on floor tiles and mastic in internal workplace facilities constituted an environmental issue that could give rise to liability based upon an Environmental Law or arising from the disposal of a Regulated Material."[68]  However, that disclosure was an "additional item noted by the Buyer" on the disclosure sheet and no similar additional items are included for the Katy Road site or Gulf Metals site, which describe groundwater and soil contamination and state Superfund liability.[69]

Many of Cooper's responsive arguments are duplicative of those in its motion and are addressed below.  The same is true of many of Defendants' responsive arguments, which have been set forth in this section.  The court will next address Cooper's arguments and authorities.

---

[66]See SPA § 3.15(a), Exhibit 1 to Defendants' Motion, Docket Entry No. 29, p. 35.

[67]See Disclosure Schedule Section 3.15, Exhibit 15 to Defendants' Motion, Docket Entry No. 30-15, p. 2.

[68]See Defendants' Motion, Docket Entry No. 29, p. 19.

[69]See Disclosure Schedule Section 3.15, Exhibit 15 to Defendants' Motion, Docket Entry No. 30-15, p. 2.

ii.   Plaintiff's Motion

Cooper cites <u>Uribe v. Merchants Bank of New York</u>, 693 N.E.2d 740, 742 (N.Y. 1998), for the proposition that although words in a contract should generally be interpreted by their ordinary meaning, a word or phrase that is a term of art should be interpreted according to its technical meaning.[70]  In <u>Uribe</u> the court rejected a party's argument that "valuable papers" was an ambiguous term that could be read to include currency or cash.  <u>Id.</u> at 338.  The court noted that in "usual parlance and understanding, the term 'valuable papers' is customarily limited to various kinds of legal or business documents."  <u>Id.</u> at 742 (citations omitted).  The court also found that traditional rules of contract construction supported its conclusion, and was "not persuaded . . . that paper money and stacked bills, because not expressly excluded, may be treated as included within the term of art-"valuable papers."  <u>Id.</u> at 743 (citations omitted).  The court concluded that "the term 'valuable papers' should not be enlarged and transformed by the courts to allow the deposit of cash, a specific authorization the box rental agreement failed to specify.  The definition this commercial dealer now proposes rests on an impermissibly 'strain[ed] reading] to find an ambiguity which otherwise might not be thought to exist.'"  <u>Id.</u> (quoting <u>Loblaw, Inc. v. Employers' Liability Assurance Corp., Ltd.</u>, 442 N.E.2d 438, 441 (N.Y. 1982)).  Thus, the

---

[70]<u>See</u> Plaintiff's Motion, Docket Entry No. 27, p. 12.

use of a term of art and its technical meaning did not render the agreement ambiguous. See id.; see also Madison Avenue Leasehold, LLC v. Madison Bentley Associates, LLC, 811 N.Y.S.2d 47, 52 (N.Y. App. Div. 2006), aff'd, 861 N.E.2d 69 (N.Y. 2006).

"While words are generally assigned their ordinary meaning, where a word has attained the status of a term of art and is used in a technical context (here, ["default" in] a lease), the technical meaning is preferred over the common or ordinary meaning." Generally, "[p]arties who engage in transactions based on prevailing law must be able to rely on the stability of such precedents." Madison Avenue Leasehold, 811 N.Y.S.2d at 52. "[I]t is axiomatic that the parties to an agreement will interpret the instrument governing their relationship in accordance with existing law." Id. at 53.

Cooper argues that "disposed of on" and "discharged into" are terms of art as used in § 5.22(f).[71] "Disposal" is defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") at 42 U.S.C. § 9601(29) (referencing the definition in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3)), and the definition uses "discharge":

> The term **"disposal"** means the **discharge**, deposit,
> injection, dumping, spilling, leaking, or placing of any
> solid waste or hazardous waste into or on any land or
> water so that such solid waste or hazardous waste or any
> constituent thereof may enter the environment or be

---

[71]See Plaintiff's Motion, Docket Entry No. 27, p. 13.

emitted into the air or **discharged** into any waters, including ground waters.

42 U.S.C. § 6903(3) (emphasis added).[72]

The New York Supreme Court has recognized that "discharge" and "dispersal" are "terms of art in environmental law used with reference to damage or injury caused by disposal or containment of hazardous waste." See Belt Painting Corp. v. TIG Insurance Co., 795 N.E.2d 15, 20 (N.Y. 2003) (quoting Continental Casualty Co. v. Rapid-American Corp., 609 N.E.2d 506, 509 (N.Y. 1993)). In Belt Painting Corp., 795 N.E.2d at 16, the court addressed the applicability of a pollution exclusion endorsement in an insurance policy that excluded coverage for: "'Bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." An employee sued the plaintiff, Belt Painting, alleging injury due to inhaling paint fumes in an office where he performed painting and stripping work. Id. Belt Painting's insurer refused to defend or indemnify the suit, relying on the exclusion. Id. at 17.

The court examined the history of environmental exclusions in insurance policies.[73] See id. at 17-20. The fact that "discharge"

_____

[72]Cooper also argues that "[t]his specialized meaning comports with the understanding of Cooper's counsel who was responsible for the language of the indemnity provisions at the time of drafting." Plaintiff's Motion, Docket Entry No. 27, p. 13 (cross-referencing Plaintiff's Motion Section II.A).

[73]In the unique context of insurance policies, "[t]o 'negate coverage by virtue of an exclusion, an insurer must establish that (continued...)

-27-

and "disposal" are "terms of art in environmental law," "support[ed the] conclusion that [the exclusion] does not clearly and unequivocally exclude a personal injury claim arising from indoor exposure to plaintiff insured's tools of its trade." <u>Id.</u> at 20. The court held that "[a]s one court noted in a similar factual setting, 'it strains the plain meaning, and obvious intent, of the language to suggest that these fumes, as they went from the container to [the injured party's] lungs, had somehow been "discharged, dispersed, released or escaped."'" <u>Id.</u> (quoting <u>Meridian Mutual Insurance Co. v. Kellman</u>, 197 F.3d 1178, 1184 (6th Cir. 1999)). The Supreme Court affirmed the appellate court's grant of summary judgment to Belt Painting because the insurer did not show that the language in its exclusion unambiguously applied to the underlying personal injury claim. <u>Id.</u> at 16.

Courts have also rejected the proposition that emission of asbestos into the internal workplace air is a disposal into the "environment" in the CERCLA environmental context. <u>See, e.g.</u>, <u>Sycamore Industrial Park Associates v. Ericsson, Inc.</u>, 546 F.3d 847, 853 (7th Cir. 2008) (reaffirming that "when there is no

---

[73] (...continued)
the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'" <u>Belt Painting Corp.</u>, 795 N.E.2d at 17 (citations omitted). "It follows that policy exclusions are given a strict and narrow construction, with any ambiguity resolved against the insurer." <u>Id.</u> The court held in favor of the insured based on its finding that the policy was ambiguous, but acknowledged the environmental terms of art. <u>Id.</u> at 20-21.

emission into the outside environment, but rather any hazard resulting from emission of asbestos fibers would be confined inside a building, there is no release or threatened release, and thus there can be no liability under CERCLA" and citing cases holding that "the release of asbestos inside a building, with no leak outside, . . . is not governed by CERCLA" and "the interior of a place of employment is not the environment for purposes of CERCLA"). A New York court has found similarly. <u>See, e.g.</u>, <u>Ruffing v. Union Carbide Corp.</u>, 746 N.Y.S.2d 798, 809 (N.Y. Sup. Ct. 2002) ("Thus, notwithstanding that the term 'environment' includes the 'ambient air within the United States', numerous courts considering [CERCLA] have determined that 'the "environment" referred to in the statute "includes the atmosphere, external to the building,"' but not the air within a building." (citations omitted)), <u>aff'd</u>, 766 N.Y.S.2d 439 (N.Y. App. Div. 2003). Defendants argue that this is not a CERCLA case, not limited to hazardous materials, that insurance exclusion cases are distinguishable, and that Cooper's reading of the clause is too narrow.[74]

> iii.   The SPA Unambiguously Assigns Asbestos Workplace
>        Injury Liabilities to Wyman

Having carefully considered the parties' arguments, the court concludes that § 5.22(f) unambiguously applies only to external

---

[74]<u>See</u> Defendants' Response, Docket Entry No. 34, pp. 11-12.

environmental discharges or disposals and that Wyman assumed
liability for asbestos-related personal injury claims by employees.
All terms used in a contract must be given meaning. Lawyers' Fund
for Client Protection of the State of New York v. Bank Leumi Trust
Co. of New York, 727 N.E.2d 563, 566-67 (N.Y. 2000). Under
§ 5.22(e), Wyman broadly agreed to indemnify Cooper for "any
noncompliance of the operations, properties or business activities
. . . with any Environmental Law" and for "any liabilities or
obligations . . . based upon any Environmental Law, or arising from
the disposal of any Regulated Materials."[75] In § 5.22(f) Cooper
retained the obligation to indemnify Wyman only for "Regulated
Materials disposed of on, or discharged into the environment" at
the Gulf Metals and Katy Road sites.[76] Under this language, Wyman,
not Cooper, is responsible for liabilities and obligations based
upon any Environmental Law, and the more specific clause in
§ 5.22(f) carves out limited liabilities for which Cooper will
indemnify Wyman. See In re Arcapita Bank B.S.C.(c), 520 B.R. 15,
26 (Bankr. S.D.N.Y. 2014) (discussing the rule of contract
construction that the more specific clause controls the general
clause). The court cannot read "disposed of on, or discharged into
the environment" out of § 5.22(f); these terms must be given

---

[75]See SPA § 5.22(e)(ii)(A), (e)(ii)(B), Exhibit 1 to
Defendants' Motion, Docket Entry No. 30-1, p. 102.

[76]See id. § 5.22(f)(ii), p. 104.

meaning, and the contract must be read as a whole.   See Lawyers'
Fund for Client Protection, 727 N.E.2d at 566-67.

    Turning   to   whether   "environment"   includes   the   internal
workplace: elsewhere, the SPA lists both "environment" and
"workplace," indicating that the parties did not use them
synonymously.   "Environmental Laws" "means all Laws concerning,
relating to or controlling . . . the introduction of any material,
substance . . . or other emission into the environment or workplace
. . . ."[77]  The carve-out in § 5.22(f) is only for discharges into
the environment.   These are separate terms and cannot be read
synonymously because the parties used them both.   See NFL
Enterprises LLC v. Comcast Cable Communications, LLC, 851 N.Y.S.2d
551, 557 (N.Y. App. Div. 2008) ("The use of different terms in the
same agreement strongly implies that the terms are to be accorded
different meanings.").   Also, § 5.22(f) does not use the broad term
"Environmental Laws."   That term only appears in § 5.22(e) in the
discussion of Wyman's duty to indemnify.

    The case Defendants rely on, Tragarz, is distinguishable and
based on non-binding Illinois law.   The court addressed a matter of

---

[77]SPA § 3.15(b), Exhibit 1 to Defendants' Motion, Docket Entry
No. 30-1, p. 35 (emphasis added).  Defendants argue that although
some OSHA regulations use the phrase "environment or workplace,"
others refer to the "workplace environment."  See Defendants' Reply
in Support of Motion for Summary Judgment, Docket Entry No. 38,
p. 12.  The SPA itself discusses the "environment or workplace" and
elsewhere only the "environment."  See SPA § 3.15(b), Exhibit 1 to
Defendants' Motion, Docket Entry No. 30-1, p. 35; id. § 5.22(f),
p. 104.

Illinois statutory interpretation specific to the issues raised by that statute, which apportioned liability in multi-defendant cases involving bodily injury, death, or physical damage to property, based on negligence or product liability based on strict tort liability. <u>See</u> <u>Tragarz</u>, 980 F.2d at 425 (quoting Ill. Rev. Stat., ch. 110, ¶ 2-1117).  The court noted that, because they are "two very different statutes," "we must remember that CERCLA, a federal statute, focuses on the national concern of public health and environment while Illinois's joint and several liability statute focuses on individual, personal injury and property claims.  With this change in focus may come a change in the meaning of the term environment." <u>Id.</u> at 427, 428.

The Seventh Circuit's holding was made in the absence of guidance from Illinois courts on the meaning of Illinois' tort fault distribution statute, while New York courts have interpreted "discharge" and "dispersal" in the environmental context. <u>See</u> <u>id.</u> at 426, 427.  The <u>Tragarz</u> court also recognized its own precedent regarding the use of "discharge" and "dispose" in the environmental/CERCLA context, which aligns with New York courts' interpretation.  <u>See</u> <u>id.</u> at 427 (acknowledging its prior holding that "release into the environment from a facility under [the re-authorization of CERCLA] did not include releases into the internal workplace environment, at least where a worker is the injured party" (discussing <u>Covalt v. Carey Canada Inc.</u>, 860 F.2d 1434 (7th

-32-

Cir. 1988)).  "Clauses can, of course, be ambiguous in one context and not another." <u>Continental Casualty</u>, 609 N.E.2d at 512, 513.[78]

The court finds that "disposed of on" and "discharged into" are terms of art that should be interpreted according to their technical meaning and concludes that the contract is unambiguous.[79] <u>See, e.g.</u>, <u>Belt Painting Corp.</u>, 795 N.E.2d at 20 ("[T]he terms used in the exclusion to describe the method of pollution—such as 'discharge' and 'dispersal'—are 'terms of art in environmental law used with reference to damage or injury caused by disposal or containment of hazardous waste.'") (citation omitted).  They must also be read in the context of the contract as a whole.  Wyman broadly assumed Forged Products' liabilities, while Cooper retained liability Regulated Materials "disposed of on" or "discharged into" the environment, as commonly understood in the context of

---

[78]The court held that the clause was ambiguous "with regard to whether the asbestos fibers at issue—fibers inhaled by persons working closely with or suffering long-term exposure to asbestos products—were discharged into the 'atmosphere' as contemplated by the exclusion." <u>Id.</u> at 512; <u>see also</u> <u>id.</u> at 513 ("Ambiguity is further revealed by examining the purpose of the clause, meant to exclude coverage for environmental pollution.") (citation omitted).

[79]Although the court cannot consider extrinsic evidence when the terms of a contract are unambiguous, the court notes that its conclusion is consistent with that of the Cooper-Cameron arbitration panel, which found it "clear from the SPA that Cooper transferred all liabilities to [Wyman] in the SPA" including asbestos liabilities, so that the underlying asbestos lawsuits related to Forged Products were not Cooper's Retained Liabilities under the subsequent ATA. <u>See</u> Cameron Corporation, Claimant, and Cooper Industries, LLC, Respondent, Panel's Decision on Motions for Summary Judgment ("Arbitration Panel's Decision"), Exhibit 13 to Plaintiff's Motion, Docket Entry No. 28-16, p. 3.

environmental regulations.   See Madison Avenue Leasehold, 811
N.Y.S.2d at 52.   Likewise, "environment," when read in the context
of the SPA as a whole, unambiguously describes something besides
the internal workplace, which is a separate term used elsewhere and
omitted from § 5.22(f).   See Uribe, 693 N.E.2d at 743.   Therefore,
the court concludes that Cooper is entitled to summary judgment on
its first claim against Wyman regarding construction of SPA
§§ 5.22(e) and (f).

**B.   SPA § 5.22(c)**

Defendants also argue that they are entitled to summary
judgment "because no duty to indemnify is owed under the SPA until
Losses   exceed   $100,000   pursuant   to   Section   5.22(c)."[80]
Section 5.22(c) of the SPA provides in full:   "Notwithstanding any
contrary provision, no claim by either party against the other for
indemnification arising under this Article V shall be valid and
assertible unless the aggregate amount of Losses associated with
such claim shall exceed $100,000."[81]   Defendants argue that since
"Cooper previously admitted that its total Losses associated with
Mr. Gatlin's claim are less than $15,000 . . . until and unless the

---

[80]Defendants' Motion, Docket Entry No. 29, p. 27 ("Cooper's
requests for declaratory relief are overbroad and should be denied
except in particular cases where Cooper proves it has satisfied the
contractual requirements for indemnification[.]"); Defendants'
Response, Docket Entry No. 34, pp. 26-27.

[81]SPA § 5.22(c), Exhibit 1 to Defendants' Motion, Docket Entry
No. 30-1, p. 101.

total Losses exceed $100,000, Wyman has no duty to indemnify Cooper."[82]  Cooper responds that asbestos personal-injury claims in the aggregate are well in excess of $100,000 and that Defendants waived a contrary construction of the SPA by paying individual claims under $100,000 for over a decade.[83]   "A waiver, the intentional relinquishment of a known right, may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage."  Hadden v. Consolidated Edison Co. of New York, Inc., 382 N.E.2d 1136, 1138 (N.Y. 1978) (citations omitted); see also Gilbert Frank Corp. v. Federal Insurance Co., 520 N.E.2d 512, 514 (N.Y. 1988).  The court concludes that summary judgment for Defendants is not appropriate on this issue given the use of the word "aggregate" and Defendants' ongoing practice of contributing to individual claims of less than $100,000.[84]

## C.   Estoppel

Cooper argues that the arbitration decision, which was subsequently confirmed in state court, collaterally estops Defendants from arguing that all asbestos-related liability from

---

[82]See Defendants' Motion, Docket Entry No. 29, p. 27.

[83]See Plaintiff's Response, Docket Entry No. 31, p. 20.

[84]See Exhibit 5 to Plaintiff's Response, Docket Entry Nos. 32-5, 32-6, 32-7, 32-8 (correspondence and invoices regarding multiple cases); Exhibit 13 to Plaintiff's Response, Docket Entry No. 32-16, pp. 8-10 (arbitration demand with summary chart of payments, none of which exceed $100,000); Exhibit 14 to Plaintiff's Response, Docket Entry No. 32-17 (invoices to and checks from Wyman for Bentley litigation beginning in 1995 totaling less than $43,000).

the Katy Road site remained with Cooper.[85]  Defendants argue that
they are entitled to summary judgment on this claim because they
were not parties to the arbitration nor in privity with any party
to the arbitration, and the indemnification obligations under
§ 5.22(f) were not fully and fairly litigated.[86]

Collateral estoppel "precludes the relitigation of identical
issues of fact or law which were actually litigated and essential
to the prior judgment." Eagle Properties, Ltd. v. Scharbauer, 807
S.W.2d 714, 721-22 (Tex. 1990).  A party seeking to invoke
collateral estoppel must show:  (1) the facts sought to be liti-
gated in the second action were fully and fairly litigated in the
first action; (2) the facts were essential to the judgment in the
first action; and (3) the parties, or persons in privity with them,
were cast as adversaries in the first action.  See Daniels v.
Equitable Life Assurance Society of the United States, 35 F.3d 210,
213-14 (5th Cir. 1994) (citing Mower v. Boyer, 811 S.W.2d 560, 563
(Tex. 1990); Eagle Properties, 807 S.W.2d at 721; Bonniwell v.
Beech Aircraft Corp., 663 S.W.2d 816, 818 (Tex. 1984)); Calabrian
Corp. v. Alliance Specialty Chemicals, Inc., 418 S.W.3d 154, 158
(Tex. App.—Houston [14th Dist.] 2013, no pet.); John G. & Marie
Stella Kenedy Memorial Found. v. Dewhurst, 90 S.W.3d 268, 288 (Tex.

---

[85]See Plaintiff's Motion, Docket Entry No. 27, p. 23;
Arbitration Panel's Decision on Motions for Summary Judgment,
Exhibit 13 to Plaintiff's Motion, Docket Entry No. 28-16; Judgment
Confirming Arbitration Award Under Seal, Exhibit 15 to Plaintiff's
Motion, Docket Entry No. 28-18.

[86]See Defendants' Motion, Docket Entry No. 29, pp. 28-30.

2002).  Federal courts "give the same preclusive effect to state court judgments that those judgments would be given under the law of the state in which judgment was rendered."  Daniels, 35 F.3d at 213 (citing 28 U.S.C. § 1738).

Genuine issues of material fact remain regarding Wyman and Precision's relationship to Cameron and the Cooper-Cameron arbitration.  Wyman and Precision were not parties to the arbitration and did not have a contractual right to participate in arbitration with Cooper.[87]  Bruce Himmelreich, counsel for Cameron at the time, testified that Cameron did not act as Defendants' agent in the arbitration, Cameron did not seek any advice or consent from Defendants, Cameron did not report to Defendants regarding the status of the arbitration, Cameron never agreed to pursue any argument or strategy for the benefit of Defendants, and Cameron never shared any information or ideas with Defendants in order to pursue any arguments in the arbitration.[88]  Cooper contends that Wyman coordinated with Cameron regarding the Forged Products claims, as evidenced by emails and the Rule 11 Agreement.[89]

─────────────

[87]Himmelreich Deposition, Exhibit 5 to Defendants' Motion, Docket Entry No. 30-5, p. 10 at 74:7-23; p. 11 at 92:24 to p. 12 at 93:4.

[88]See id. p. 16 at 97:1 to p. 17 at 98:2.

[89]See Email from Emi Donis (Precision) re: ADR in Cooper/Wyman agreement, Exhibit 8 to Plaintiff's Motion, Docket Entry No. 28-11 ("We could send our written dispute notice at the same time you serve your arbitration claim, which would require them to meet with us . . .  The Cameron/Wyman one-two punch should get their attention."); Email from Susan Swanson (counsel for Cameron) re: Cameron v. Wyman Gordon/Precision Castparts, Exhibit 9 to (continued...)

"Although the circumstances of each case must be examined, generally, parties are in privity for purposes of collateral estoppel when:  (1) they control an action even if they are not parties to it; (2) their interests are represented by a party to the action; or (3) they are successors in interest . . . ."  HECI Exploration Co. v. Neel, 982 S.W.2d 881, 890 (Tex. 1998); see also Ayre v. J.D. Bucky Allshouse, P.C., 942 S.W.2d 24, 27 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("A privy is one who is connected in law with a party to the judgment as to have such an identity of interests that the party to the judgment represented the same legal right. (citation omitted). . . ."[90]  However, privity is not established by the mere fact that persons may happen to be interested in the same question or in proving the same facts. Phillips v. Allums, 882 S.W.2d 71, 74 (Tex. App.—Houston [14th Dist.] 1994, writ denied)") (citing Benson v. Wanda Petroleum Co., 468 S.W.2d 361, 363 (Tex. 1971).)).[91]  Based on the summary judgment

---

[89](...continued)
Plaintiff's Motion, Docket Entry No. 28-12 ("Pursuant to discussions during the telephone conference on May 21, 2009, attached please find Cameron's arbitration demand directed to [Cooper] that we plan to send today."); Rule 11 Agreement, Exhibit 7 to Plaintiff's Motion, Docket Entry No. 28-10.

[90]The parties agree that Texas law applies to this issue.  See Plaintiff's Motion, Docket Entry No. 27, p. 24 n.16; Defendants' Motion, Docket Entry No. 29, p. 28.

[91]Plaintiffs cite Taylor v. Sturgell, 128 S. Ct. 2161, 2179 (2008), but that case addressed the situation where "preclusion [applies] because a nonparty to an earlier litigation has brought suit as a representative or agent of a party who is bound by the prior adjudication."  Here, Cooper is arguing that a party to current litigation was formerly represented by another party in an earlier adjudication.

-38-

evidence, the court cannot conclude that Cameron was controlled by
Wyman and Precision or that their interests were represented by a
party with "such an identity of interests that the party to the
judgment represented the same legal right."[92]   While they may have
been interested in the same question or proving the same facts,
Defendants have provided evidence sufficient to raise a factual
question as to whether Cameron and Precision and Wyman were in
privity.

_____

[92]Cooper argues that "Wyman should also be precluded from
disavowing responsibility for Forged Products personal injury
asbestos claims based on the doctrine of quasi-estoppel."
Plaintiff's Motion, Docket Entry No. 27, p. 29.   Because Wyman
accepted its liability for more than a decade, Cooper asserts that
it did not bring an action to enforce the SPA years ago, when more
documents and witnesses were available.   See id.   Cooper asserts
that Wyman benefitted by accepting insurance proceeds from Cameron
for some of the claims.   "Quasi-estoppel precludes a party from
asserting, to another's disadvantage, a right inconsistent with a
position previously taken.   The doctrine applies when it would be
unconscionable to allow a person to maintain a position
inconsistent with one to which he acquiesced, or from which he
accepted a benefit."   Lopez v. Munoz, Hockema & Reed, L.L.P., 22
S.W.3d 857, 864 (Tex. 2000) (citations omitted).   Quasi-estoppel is
an equitable doctrine that generally operates as an affirmative
defense, and can thus be waived.   See Stinnett v. Colorado
Interstate Gas Co., 227 F.3d 247, 256 (5th Cir. 2000); Yturria v.
Kerr-McGee Oil & Gas Onshore, LP, No. 7:05-cv-181, 2006 WL 3227326,
at *12 (S.D. Tex. Nov. 6, 2006), aff'd sub nom. Yturria v. Kerr-
McGee Oil & Gas Onshore, LLC, 291 F. App'x 626 (5th Cir. 2008).
Cooper argues that it is not an affirmative defense in this case
because Defendants have not asserted counterclaims.   Quasi-estoppel
is not mentioned in any pleading except Plaintiff's Motion and
Reply in Support, and defendants argue that it is waived now that
discovery has closed, prejudicing Defendants' ability to respond.
Lucas v. United States, 807 F.2d 414, 417-18 (5th Cir. 1986)
(citations omitted); see also Fed. R. Civ. P. 8(c).   Cooper is not
entitled to summary judgment on this issue, if it is even entitled
to raise it at this point in the litigation.

### D.   Precision's Liability Under the SPA

Defendants argue that Precision is entitled to summary judgment because it is not liable for any obligations under the SPA as a non-party thereto.[93]   Cooper responds that Precision has adopted Wyman's obligations under the SPA since acquiring Wyman in 2000 and should not be allowed to now hide behind its corporate form.[94]  Defendants argue that "[l]iability can never be predicated solely upon the fact of a parent corporation's ownership of a controlling interest in the shares of its subsidiary." SUS, Inc. v. St. Paul Travelers Group, 75 A.D.3d 740, 743 (N.Y. App. Div. 2010) (citation omitted).   Thus, Defendants argue, the plaintiff must allege "facts sufficient to pierce the veil of a parent corporation in order to make it liable for its subsidiary's liabilities."[95]   See generally id.

Under Oregon law, which the parties agree applies,[96] "piercing the corporate veil 'is an extraordinary remedy which exists as a

_____

[93]Defendants' Motion, Docket Entry No. 29, p. 7.

[94]See Plaintiff's Response, Docket Entry No. 31, pp. 22-24.

[95]See Defendants' Motion, Docket Entry No. 29, p. 30.

[96]Defendants cite New York choice of law principles, which dictate that "[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders."  See Defendants' Motion, Docket Entry No. 29, p. 30 n.3 (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (citations omitted)).  Precision is an Oregon corporation, and thus Oregon law therefore applies.  Id. (citing Complaint, Docket Entry No. 1, p. 2 ¶ 5).  Cooper does not challenge these assertions and cites the same Oregon case in support of its veil-piercing and alter ego arguments.  See Plaintiff's Response, Docket Entry No. 31, p. 23.

last resort, where there is no other adequate and available remedy
to repair plaintiff's injury." State ex rel. Neidig v. Superior
National Insurance Co., 173 P.3d 123, 131 (Or. 2007). Oregon law
"requires a plaintiff seeking to pierce the corporate veil to prove
that another entity actually controlled (or was under common
control with) the corporation, that the other entity used its
control over the corporation to engage in improper conduct, and
that, as a result of the improper conduct, the plaintiff was
harmed." Id. at 136.

Cooper responds that Precision is liable because it controlled
Wyman and acted as Wyman's alter ego.[97] As examples, Cooper points
to evidence in the summary judgment record that Precision made
payments to Cooper for Forged Products liabilities on Precision
checks;[98] demanded mediation under the SPA in a letter from
Precision's Deputy General Counsel on Precision letterhead;[99] and
participated, via the attendance of Precision's Deputy General
Counsel, in settlement talks in the Sutterfield case in which Wyman
was sued for Forged Products liabilities.[100] Precision's counsel

---

[97]See Plaintiff's Response, Docket Entry No. 31, p. 23.

[98]See, e.g., Precision checks made payable to Cooper,
Exhibit 5-2 to Plaintiff's Motion, Docket Entry No. 28-6, pp. 173,
175, 177, 179.

[99]See Confidential Settlement Negotiations dated June 3, 2009,
Re: Indemnity Dispute from Precision to Cooper, Exhibit 10 to
Plaintiff's Motion, Docket Entry No. 28-13; Exhibit 17 to
Plaintiff's Response, Docket Entry No. 32-20.

[100]See Himmelreich Deposition, Exhibit 6 to Plaintiff's
Response, Docket Entry No. 32-9, p. 4 at 26:7-27:5 and p. 6 at
34:9-25.

worked with Cameron in seeking arbitration against Cooper.[101] Cooper also argues that Precision "orchestrated and carried out" the "repudiation of Wyman's responsibilities under the SPA," which justifies piercing the corporate veil.[102] Given this evidence, the court concludes that Cooper has raised a genuine issue of material fact regarding Precision's liability, and summary judgment for Defendants is not appropriate on this point.

## IV. Conclusion and Order

For the reasons discussed above, the court concludes that summary judgment in Cooper's favor is appropriate on its first claim regarding construction of the SPA's indemnity provisions as they apply to Wyman. The parties' agreement unambiguously assigns the duty to indemnify and defend asbestos personal-injury claims stemming from employment at the Katy Road site to Wyman. However, fact issues remain regarding the meaning of the $100,000 "aggregate amount of Losses" in § 5.22(c), Precision's liability as a non-signatory to the SPA, and Cooper's estoppel claims. Therefore, Plaintiff Cooper Industries, LLC's Motion for Summary Judgment

---

[101] See Email from Emi Donis (Precision) re: ADR in Cooper/Wyman agreement, Exhibit 8 to Plaintiff's Motion, Docket Entry No. 28-11; Exhibit 15 to Plaintiff's Response, Docket Entry No. 32-18.

[102] See Plaintiff's Response, Docket Entry No. 31, pp. 23–24; Himmelreich Deposition, Exhibit 6 to Plaintiff's Response, Docket Entry No. 32-9, p. 4 at 26:7-25; Email from Himmelreich at Cameron to Precision and Wyman detailing the concern at the breakdown of the payment arrangement after the Sutterfield settlement, Exhibit 18 to Plaintiff's Response, Docket Entry No. 32-21.

(Docket Entry No. 27) is **GRANTED IN PART** and Defendants' Motion for Summary Judgment (Docket Entry No. 29) is **DENIED**.

Since fact issues remain for trial, the Joint Pretrial Order will be filed by October 7, 2016, and Docket Call will be held on October 14, 2016, at 3:00 p.m., in Courtroom 9-B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this 14th day of September, 2016.

SIM LAKE
UNITED STATES DISTRICT JUDGE